COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| JIMMY LEE WRIGHT, | § | No. 08-20-00056-CR |
| Appellant, | § | Appeal from the |
| v. | § | 143rd Judicial District Court |
| THE STATE OF TEXAS, | § | of Reeves County, Texas |
| Appellee. | § | (TC#18-08-08305-CRR) |

## **O P I N I O N**

Appellant, Jimmy Lee Wright ("Wright"), appeals from his conviction for aggravated sexual assault of an elderly person for which he was sentenced to seventy-five years in prison. In a single issue, Wright complains the trial court erred by admitting into evidence out-of-court statements made by the victim, who was deceased at the time of his trial and therefore unavailable for cross-examination, in violation of his Sixth Amendment Right to Confrontation. While we find error, we believe the error was harmless beyond a reasonable doubt. We affirm.

## **BACKGROUND**

### A. **The Sexual Assault**

Seventy-seven-year-old "V.H." was sexually assaulted in her home by an unknown assailant at approximately 10:30 p.m. on September 10, 2011. Later that evening, Elizabeth

Arenivaz, a sergeant with the Pecos Police Department, responded to a dispatch referencing a sexual assault. Sergeant Arenivaz arrived at V.H.'s home at approximately 11:45 p.m. Upon arrival, Arenivaz learned the victim's name and age, and that an unknown male had entered the victim's residence and raped her. Sergeant Arenivaz then obtained a more detailed verbal statement from the victim which was summarized in a written incident report dated September 12, 2011, as follows:

> [V.H.] stated that unknown male had gone inside her residence and raped her. [V.H.] keeps her inner door open and keeps her screen secured. She stated she was not sure if the screen door was left unsecured or not secured properly. She stated she was asleep in the sofa in her living room when she open [sic] her eyes she saw a shadow of male. He pulled her night gown up and her underwear down. He unzipped his pants, then he got on top of her. He put his penis inside her vagina and began to sexually assaulted [sic] her. She stated she attempted to push him off but he held her down and told her to shut up. She stated that when he was finished raping her he told her he loved her and had loved her for a long time. He zipped his pants up and left the house. She stated she did not have any description on the male because it was to [sic] dark to see. She did not recognize his voice. She then took a shower and then called the Police. She stated he did not threaten her nor did he hit her.

## B.    The Sexual Assault Investigation

After receiving a request for assistance from Sergeant Arenivaz, Helen Vernon, a sergeant investigator with the Pecos Police Department, arrived at V.H.'s home at approximately 11:55 p.m. Sergeant Vernon was responsible for securing the crime scene and collecting evidence. In addition to obtaining photographs of the crime scene, victim, and physical evidence, which included a blanket, pillow, pillowcase, nightgown, and underwear. Sergeant Vernon also obtained a verbal statement from V.H., which was summarized in a written "investigation detail" report dated September 15, 2011, as follows:

> [V.H.] was asleep on the couch with the front door open and the screen door shut. She couldn't remember if she had locked the screen door. It was dark in the house.

2

She woke up when she felt someone over her. She yelled 'get out' and 'go away' and tried to get up. The suspect stated 'hush up' and pushed her down holding her by the shoulders as he climbed on top of her. The suspect did not kiss her and did not touch her breasts. He straddled her with one knee beside her on the couch and the other leg on the floor by the couch. Sorta half on half off of her and pulled up her night gown just enough where he could get to her underware [sic]. He said he love[d] her and had loved her for a long time. He pulled down her underware [sic] unzipped his pants and laid down on top of her with his head on the left side of hers. The suspect put his penis inside her vagina and started pumping in and out. He kept telling her to finish, she didn't know what he meant by that but she was trying to finish so he would leave. [V.H.] stated she he [sic] was inside her what felt like 15 to 20 minutes. The suspect didn't say anything else or make any noise during intercourse. He pulled his penis out and zipped his pants back up. [V.H.] stated that he didn't have disctictive [sic] smells, no accent and no facial stubble that she felt.[1]

After completing the crime-scene investigation, Sergeant Vernon transported V.H. to Midland Memorial Hospital where a sexual assault forensic exam was performed. The exam was performed at approximately 4:00 a.m. on September 11, 2011 by Donna Doyle, a sexual assault nurse examiner ("SANE"). During the medical exam, Nurse Doyle entered information on a six-page sexual assault nurse examiner report ("SANE Report"). One document contained within the SANE Report was a form entitled Sexual Assault Examination Forensic Report Form ("SAEFR Form").

C.      **The Sexual Assault Forensic Examination Report Form**

The SAEFR Form instructed the examiner that it "be filled out with medical information gathered from the patient." It also instructed the examiner to "inform the patient that, should the case go to court, it may be necessary to gather additional evidence at a later time." The SAEFR Form, like the rest of the SANE Report, appears to be written on carbon paper and indicates that the white copy goes to the "Medical Facility," the yellow copy goes to a "Law Enforcement

---

[1] Sergeant Vernon also subsequently obtained a recorded statement from V.H. on September 19, 2011. However, the State did not attempt to introduce the recorded statement into evidence at trial.

Representative," and the pink copy goes to "Lab." The SAEFR Form documented the patient's identifying and contact information, such as name, date of birth, sex, address, and phone number. The SAEFR Form also asked for medical information, including "vital signs" such as temperature, pulse, respiration, blood pressure, known allergies. and current medications.

One section of the SAEFR Form entitled "History of Assault," asked for the "patient's description of pertinent details of the assault—if known by patient, such as orifice penetrated, digital penetration or use of foreign object, oral contact by assailant, oral contact by patient." Nurse Doyle wrote down V.H.'s response to this question as follows:

> I was sleeping on the couch. My screen door was latched, but the other door was open. I heard the door open. He said, 'Be quiet.' I took his shoulders and pushed up. He laid down on me. He unzipped his pants, pulled up my gown and down my panties. He stuck his penis inside me and then he told me to finish. I think he wanted me to have an orgasm. I think it all took 10 minutes and he left. I took a bath. It was dark, so I couldn't see what he looked like.

Within the SANE Report was another document, entitled Sexual Assault Forensic Examination ("SAFE form") Step 2, which contained information about V.H.'s "Significant Past Medical History." A notation was made that V.H. had obtained a hysterectomy and that she "denie[d]" using vaginal tampons. The SAFE form asked for "Impressions From Exam" to which the response was "Sexual assault by history. See genital and body surface diagram." Attached to the SAFE form was a body diagram documenting physical signs of penetration in the area of V.H.'s sexual organ.

Nurse Doyle also collected DNA evidence while performing the sexual assault exam, including fingernail scrapings and vaginal swabs. The DNA evidence was stored in a rape kit, which Nurse Doyle sealed and turned over to Sergeant Vernon at approximately 5:20 a.m. Sergeant Vernon subsequently shipped the rape kit to a Texas Department of Public Safety ("DPS") crime

4

lab in El Paso on October 5, 2011. On the same day, a supplemental report was created by Sergeant Vernon in which she wrote:

> VH had a hysterectomy and denies using tampons. She has not had sex since 1989. According to the body diagram page of the SANE paperwork there was redness to hymen from 2 to 5 and 6 to 9 o'clock, redness to bilateral labia: majora, redness on the fossa navicularis from 5 o'clock to 8 o'clock. There was a red abrased to cervical os.

**D.**     <u>**The DNA Evidence**</u>

In early 2012, Cathy Serrano, a DPS DNA forensic scientist, performed a DNA analysis of the evidence in the rape kit and determined that a vaginal swab contained a sperm cell fraction belonging to an unknown male. The DNA profile from the unknown male was uploaded into the Combined DNA Index System ("CODIS")[2] for future comparison to a known suspect.

Six years later, on February 22, 2018, DPS sent a CODIS Offender Letter to the Pecos Police Department stating a routine DNA Database search matched the DNA profile found on the vaginal swab to Wright's DNA profile obtained from a CODIS sample. On April 19, 2018 Daniel Young, a Texas Ranger, executed a search warrant seeking oral DNA samples from Wright, who was incarcerated in Beaumont, Texas. Ranger Young obtained four buccal swabs containing oral DNA samples from Wright, which were returned to the Pecos Police Department.

David Davis, who was assigned to the Pecos PD Criminal Investigation Unit, forwarded Wright's oral DNA samples to the DPS crime lab in El Paso, where it was compared to the DNA sample obtained from V.H.'s vaginal swab. Christine Ceniceros, a DPS DNA forensic scientist, conducted the comparison and determined the DNA profile obtained from the sperm cell fraction found on V.H.'s vaginal swab was "2.32 quintillion times more likely . . . [to have come] . . . from

---

[2] *See* TEX.GOV'T CODE ANN. § 411.141(1) defining CODIS as "the FBI's Combined DNA Index System."

Mr. Wright[,] than if the DNA [had come] from an unknown, unrelated individual."

**E.      The Criminal Prosecution**

Wright was subsequently charged by indictment with aggravated sexual assault of an elderly person. The indictment alleged in part that Wright "on or about September 10, 2011 . . . did then and there intentionally and knowingly cause the penetration of the sexual organ of [V.H.] . . . a person who was then and there an elderly individual, by defendant's sexual organ, without the consent of [V.H.]." The indictment also alleged Wright had been previously convicted of three other felonies, including Burglary of Habitation with intent to commit Rape, Burglary with intent to commit Theft, and Failure to Register as a Sex Offender.

V.H. passed away in 2019. After V.H.'s death and prior to trial, relying on United States Supreme Court opinions in *Davis v. Washington*[3] and *Crawford v. Washington,*[4] Wright filed a written motion to exclude all "out-of-court testimonial statements of a witness who does not appear at trial, until a hearing has been held outside the presence of the jury to determine whether the out-of-court witness is unavailable, and whether the Defendant has had a prior opportunity for cross-examination of that witness." Trial commenced on January 27, 2020. After a jury was chosen, the trial court considered Wright's motion to exclude V.H.'s out-of-court statements in a hearing held outside of the presence the jury.

Relying in part on *Williams v. Illinois*[5] and *Michigan v. Bryan*t,[6] the State made at least three arguments in support of its position that V.H.'s statements were nontestimonial and therefore

---

[3] *Davis v. Washington*, 547 U.S. 813 (2006).

[4] *Crawford v. Washington*, 541 U.S. 36 (2004).

[5] *Williams v. Illinois*, 567 U.S. 50 (2012).

[6] *Michigan v. Bryant*, 562 U.S. 344 (2011).

not subject to Confrontation Clause protections. First, statements to the SANE nurse were made primarily for the purpose of medical diagnosis and treatment. Second, statements to the police officers at the crime scene were not made under "formal circumstances" in that they did not result from a police interrogation conducted at the police station, nor were they formally recorded. Third, statements made to police at the crime scene were obtained while police were responding to a "continuing emergency." To establish there existed a continuing emergency, the State relied on facts establishing police merely asked "what happened to you" at the beginning of an investigation before a particular individual was identified and the statements were obtained for the primary purpose of "identify[ing] a suspect and apprehend[ing] a person," who was a "suspected rapist on the loose in Pecos, Texas."[7]

During the hearing, the trial court admitted into the record "for purposes of the hearing only, not for the purpose of evidence to be considered by a jury," the police reports written by Sergeants Arenivaz and Vernon containing their summaries of V.H.'s statements, (Ex. 1 and 2) as well as the one-page SAEFR Form containing V.H.'s summarized response to the inquiry about the "history of the assault" (Ex. 3). After taking the time to consider the parties' arguments, the trial court overruled Wright's confrontation objection, stating in relevant part:

> The Court has considered carefully the reasoning behind the *Crawford, Davis*, and *Williams* cases. Reading those together, the Court overrules the Defendant's request to have the subject of Exhibits 1, 2 and 3 [excluded] . . . .

> .        .        .

> The Court considers that with respect to all of these contacts between the

---

[7] The State also argued the statements were otherwise admissible under three exceptions to the hearsay rule: present sense impression, excited utterance, and then-existing mental, emotional, or physical condition. *See* TEX.R.EVID. 803(1-3). In its written order admitting the statements, the trial court indicated they were "not excluded under the hearsay rule," but did not indicate which exception to the hearsay rule applied. Wright does not complain on appeal that admission of the statements violated the rules of evidence.

alleged victim and law enforcement and the SANE nurse, that the primary purpose of those statements, when viewed objectively, was to catch a dangerous, unidentified suspect who was still at large . . . .

.                    .                    .

[T]he Court believes that applying the principles illustrated in *Crawford* and *Davis* and then further developed in *Williams* do lend guidance in determining whether the statements made by the alleged victim to law enforcement were intended to target any particular individual, assailant, or to even identify a particular individual assailant. The only one of those that that analysis would apply to would be the scientific evidence gathered by the SANE nurse, which is a separate inquiry. The Court instead, is focusing on the statement which appears to be approximately five and a half lines in handwriting in the upper half of State's Exhibit 3.

A written order was signed reflecting the trial court's ruling. Wright requested and was granted a running objection as to the substance of these statements.

**F.      The Relevant Trial Testimony**

At trial, the State called eight witnesses, including Sergeants Arenivaz and Vernon and Nurse Doyle. Although the State elicited testimony from Sergeant Vernon establishing she spoke to V.H., Sergeant Vernon did not testify about specific statements V.H. made to her. Sergeant Arenivaz, on the other hand, testified during direct examination in relevant part as follows:

Q. [Prosecutor] And then upon your arrival, what did you do when you arrived there?

A. I spoke to [V.H.] and she told me what had happened to her.

Q. Okay. What did she tell you first about her identification and her age?

A. Yes, sir. She said her name was [V.H.], she was 77 years old.

.                    .                    .

Q. Okay. And what did she initially tell you that had occurred?

A. She told me that an unknown male subject had gone into her residence and had raped her.

Q. Did she describe further things about what she was doing at the time this occurred?

A. She said she was asleep in her sofa or – she slept in her living room when she must have heard something. She woke up and she saw a shadow of a male subject. And she was in her nightgown. He pulled up the nightgown, pulled down her panties and began to rape her. She said after he had finished raping her, he left.

.          .          .

Q. [Prosecutor] Did she describe for you how he – anything about how he might have got into the house?

A. She said she was wasn't sure because she believed her inner door, her interior door was opened, but her exterior door, she wasn't sure if she had locked it or not.

Q. Okay. Did she describe any attempts of her in resisting this male subject?

A. She tried to push him away, but he held her down.

Q. Did she recognize the male subject in any manner?

A. No, sir.

Q. Was she able to -- why was she not able to see him?

A. The room was dark.

Q. And, in fact, was she able to describe any senses about whether she recognized the voice, recognized any smells, anything like that that would be of additional help?

A. She told me she did not recognize his voice or any smells.

Q. And about what time, if you recall, did she state that this happened?

A. I don't recall.

Q. What time did you arrive?

A. I arrived about 11:45 p.m.

Q. And the way the Pecos Police Department is setup, you have initial officers like

9

yourself that are uniformed officers, but you also have an investigative division; is that correct?

A. Yes, sir.

Q. At what point, if any time, did you contact an investigator to come assist at the investigation?

A. At that point in time, when I found out that she had been raped when she had told me, I contacted Sergeant Helen Vernon at the time.

Q. And was Helen Vernon actually able to arrive within a few minutes?

A. She was.

.             .             .

Q. Now, did the -- did [V.H.], did she describe for you anything that she did following the defendant leaving the house?

A. She took a bath or a shower after the defendant left the house.

.             .             .

Q. All right. Were you able to find out what she did with any of the clothing she was wearing at the time of the assault?

A. She threw the nightgown and underwear in the trash can.

Q. Did you confirm that those were in the trash can?

A. I did. She told me that she threw them in the kitchen trash can and I did locate the nightgown and the underwear in her kitchen trash can.

In addition, Nurse Doyle testified that the purpose of a SANE exam is "for diagnosis and treatment." And that a "history" which is acquired at the beginning of the exam is a necessary part of the exam. After the trial court admitted the six-page SANE Report, which included the SAEFR Form, into evidence "without objection,"[8] the State asked Nurse Doyle to explain the importance

---

[8] The six-page SANE Report was originally labeled Ex. 35. However, following her testimony Nurse Doyle

of the patient's statement providing a "history." The relevant part of Nurse Doyle's testimony was as follows:

> Q. [Prosecutor] Why is a statement by a patient important when conducting SANE exams?
>
> A. Well, basically, you want to know why they're there – 'tell us why you're here' -- so that way we also -- we do a detail head-to-toe and genital exam, but we also want to know, you know, what happened for medical diagnosis and treatment. If they need to see a doctor after we've gathered the evidence or even before, then we need to know what happened. So if she had a broken arm or if she had some skin tears that needs medical attention, we'll do that. The doctor does not see the exam -- or does not see the patient if they're there for a sexual assault exam. Only if we call them in for some sort of medical treatment.
>
> Q. Okay. Now, in that report, there is a statement that's, I believe, categorized as a history of the assault.
>
> A. Yes, sir.
>
> [Prosecutor]: May this witness read that statement as part of the publishing of this report, Your Honor?
>
> [Defense Counsel]: No objection, Your Honor.
>
> THE COURT: You may proceed. Ma'am, you may read the history section.
>
> THE WITNESS: Okay.
>
> A. The history of the assault, we always ask again, 'Do you know why you are here?' 'I was sleeping on the couch. My screen door was latched, but the other door was open.' This is a copy of a copy. I'm sorry. 'I heard the door open. He said, "Be quiet." I took his shoulders and pushed him up. He laid down on me. He unzipped his pants, pulled up my gown and down my panties. He stuck his penis inside me and then he told me to finish. I think he wanted me to have an orgasm. I think it all took 10 minutes and he left. I took a bath. It was dark, so I couldn't see what he looked like.'
>
> Q. [Prosecutor] So with that information, did that cause you to focus on a particular part of the body in conducting your more-focused inspection?

mistakenly took the original exhibit with her to Midland. Without objection, the State subsequently substituted Ex. 35 with a faxed copy of the SANE Report and labeled it Ex. 35B.

11

A. Yes. Yes, sir.

.         .         .

Q. So what did you observe about -- or what were the results of your physical examination of [V.H.]?

A. So, physical examination, we look also at their history. We would have told [V.H.], the patient, that if, you know, bruises show up later on, because she said he held her down. If that was the fact, we would have also told her to notify the officers if she had any bruises, because not everybody bruises the same. So -- but we did not notify -- we did not notice any documentation or I did not document any acute injury on physical -- on the body surface diagram.

Now, the genital diagram was different. We have on the labia majora, which is fatty outer lips, there were bilateral redness noted there. And then you'll also notice that on the left side of the diagram -- and we do take pictures. Not everyone wants to see those pictures, but we do have photographs. We also on the acute exam, we also diagram what we see.

On the labia minora, which is inside -- just inside on the fatty outer lips, you'll notice there it says, 'Red, abrased.' The labia minora also includes the fossa navicularis, which is at the bottom part of the female sexual organ. We were red, abrased from 5 o'clock to 8 o'clock to the fossa navicularis. And that is when you're examining them, we're pulling general bilateral traction and that's on the bottom of the female sexual organ.

The hymen, we noted redness from 2 o'clock to 5 o'clock. And from 6 o'clock to 9 o'clock. We use a clock face. Imagine if you were looking at a clock.

The vagina, no acute injury observed to the cervix. We observed redness to the face of the os and that's documented on the right-hand side.

The perineum, we didn't notice any injury -- no acute injuries. In the anus, no acute injury in the rectum of the female.

.         .         .

Q. All right. And then what is significant to you about the injuries you observed and have documented here?

A. They're consistent with her history.

Q. And that being having been sexually assaulted, as she described?

A. That's correct.

Wright did not testify and otherwise presented no evidence during his case-in-chief. The

12

State opened its closing argument by stating: "We now know, each of you now know, and the world now knows who [the] unknown person was on [September 10, 2011] when he entered the house of [V.H.]--77-year-old [V.H.] and, in her words, raped her." The majority of the State's argument, however, focused on the collection, analysis and matching of the DNA evidence found on V.H.'s swab to Wright's DNA. In its rebuttal, in addition to pointing to the "feeble[ness]" of the victim as depicted in her photograph, the State primarily used the "history" portion of the SAEFR Form, which the prosecutor read verbatim to the jury, to argue the sex was forced. Specifically, the State argued that according to V.H.'s statement contained in the SAEFR Form, she had unsuccessfully attempted to "push up on [Wright's] shoulders."

Wright's attorney argued the State failed to meet its burden of proof to demonstrate beyond a reasonable doubt that Wright had committed the offense in part because "there was no acute injury to [V.H.'s] body itself" and therefore no evidence that this sex was "rough, nonconsensual." The jury found Wright guilty. Wright elected to have the trial court assess punishment, and after hearing evidence, the trial court found two enhancement paragraphs true, and sentenced Wright to 75 years in prison.

## DISCUSSION

On appeal, Wright contends the trial court erred when it admitted over Wright's Confrontation Clause objection, V.H.'s statements made to (1) Sergeant Elizabeth Arenivaz, (2) Sergeant Helen Vernon, and (3) SANE Nurse Donna Doyle. In response, the State makes three arguments. First, Wright failed to preserve error with respect to statements made to Nurse Doyle and Sergeant Vernon. Second, statements made in response to Sergeant Arenivaz's initial questions when she first arrived at the crime scene were nontestimonial because "the primary

13

purpose" for asking the questions was "to determine what assistance to the victim was of immediate importance." Third, to the extent any other statements to Sergeant Arenivaz were testimonial, their admission was harmless because "nothing in the statement[s] pointed in any way to Appellant" and there was "overwhelming evidence from [other] sources . . . including DNA evidence" establishing Wright's guilt beyond a reasonable doubt.

## I.     SCOPE OF REVIEW

### A.     Failure to Preserve Error with Respect to Nurse Doyle's Testimony

As a threshold matter, we agree with the State that Wright waived any alleged error with respect to statements made by V.H. to Nurse Doyle during the sexual assault exam. While Wright states in his "Listing of Ground of Error" that "the statements made by [V.H.] to the SANE Nurse during her examination" were admitted in violation of the Sixth Amendment, he otherwise makes no further reference or argument related to Nurse Doyle's testimony. Indeed, unlike the officers' testimony for which Wright provides specific record citations to support his claim, Wright does not direct us to any portion of Nurse Doyle's testimony that he contends violated his Sixth Amendment Right. And throughout the substance of the argument that *was* briefed, Wright repeatedly refers to statements made to "law enforcement officials," which, in our view, omits Nurse Doyle. *See U.S. v. Barker*, 820 F.3d 167, 172 (5th Cir. 2016)(distinguishing between police officer and SANE Nurse when applying "primary purpose" analysis in context of Confrontation Clause claim.). And he makes no attempt to argue that Nurse Doyle should be treated as a law enforcement official or that the primary purpose of her examination was anything other than medical diagnosis and treatment.

Accordingly, we believe any complaint made in the trial court about the statement made to

14

Nurse Doyle during the SANE exam was waived on appeal because it was inadequately briefed. *See* TEX.R.APP.P. 38.1(i)(requiring "appropriate citations to authorities and to the record"); *Ladd v. State*, 3 S.W.3d 547, 575 (Tex.Crim.App. 1999)("requiring appellants, even capital appellants, to abide by [ ]published briefing rules and to make reasonable arguments in their own behalf does not offend traditional notions of fair play and substantial justice.")

In addition, while Wright's briefing includes a single reference to the "statement made by [V.H.] in the form of witness affidavits"[9] which presumably refers to V.H.'s statement that Nurse Doyle memorialized in the SAEFR Form, Wright made no objection at trial to the admission of the SANE Report, which included a copy of the SAEFR Form. Indeed, when the State offered the SANE Report into evidence during the jury trial, counsel for Wright affirmatively stated, "No objection, Your Honor," and it was admitted by the trial court "without objection." And again, after the SANE Report was admitted into evidence and the State signaled its intent to have Nurse Doyle read to the jury V.H.'s response to the "history of the assault" inquiry, defense counsel affirmatively stated, "No objection, Your Honor." The trial court then told the State to "proceed," and instructed Nurse Doyle to "read the history section."

Notwithstanding, the trial court's grant to Wright of a running objection as to the statement contained on the SAEFR Form earlier in the trial, defense counsel's affirmative "no objection" statements, in our view, waived the running objection as to this statement. *See Wilson v. State,* No. 08-01-00319-CR, 2003 WL 1564237, at *2 (Tex.App.—El Paso Mar. 27, 2003, no pet.)(not

---

[9] The record does not support Wright's contention that V.H.'s statement contained on the SAEFR Form was an "affidavit." There is no evidence establishing the statement was sworn, signed, or written by the victim herself. Indeed, the handwriting in which it is written appears similar to the handwriting on the rest of the SANE Report which the testimony established was written by Nurse Doyle. The only place in which the victim's signature appears is on the consent form giving permission to the medical personnel to perform the medical exam and to release the medical report to law enforcement, which is the first page of the SANE Report.

15

designated for publication)("when the defendant affirmatively asserts during trial that he has 'no objection' to the admission of the complained-of evidence, he waives any error in the admission of the evidence despite the adverse pretrial ruling.")(*citing Dean v. State,* 749 S.W.2d 80, 83 (Tex.Crim.App. 1988)); *see also Jones v. State,* No. 14-08-00869-CR, 2010 WL 26527, at *2 (Tex.App.—Houston [14th Dist.] Jan. 7, 2010, no pet.)(mem.op., not designated for publication)(despite a running objection, "error may still be waived by an affirmative statement of 'no objection' when the evidence is introduced.") Accordingly, Wright failed to preserve any error with respect to statements made to Nurse Doyle during the sexual assault exam or contained within the SAEFR form.

**B.      Failure to Show Error with Respect to Sergeant Vernon's Testimony.**

We also agree with the State that Wright fails to demonstrate evidence of any statements made to Sergeant Vernon was introduced at trial. Wright directs us to the following testimony elicited by defense counsel on cross-examination from Vernon:

A. That I arrived was about, I think, 11:55 or 2355.

Q. [Defense counsel] 11:55 or 12:55?

A. No, 2355.

Q. Oh, that's military time, correct?

A. Yes.

Q. And for people that don't normally associate time with military time, what time is that?

A. 11:55 p.m.

Q. You then proceeded to question [V.H.]?

A. Well, I just asked her what happened.

16

Q. Okay. So you questioned her, right?

A. Yes.

Q. Your job at the time, you were an investigator, correct?

A. Yes.

Q. And you were a – what's the word, Criminal Investigation Division, something like that?

A. Yes.

Q. And were you in charge of securing crime scenes and making sure evidence was collected correctly?

A. Yes.

Q. Okay. Do you remember in your statement, you stated that Officer Arenivaz walked you through the crime scene?

A. Yes.

Q. You remember doing that?

A. Yes.

Q. Do you also remember Officer Arenivaz showing you that [V.H.] had put her underwear in the kitchen trash can?

A. Yes.

Q. You then stated in your statement that you processed the crime scene. What does that mean?

A. Well, you gather up evidence, you look for fingerprints, look for how they got in or any kind of evidence that would help you determine who did it or how it was done and what happened.

Q. Okay. And you then stated in your statement that Officer Arenivaz, after I guess or during your processing of the crime scene, took the blanket, pillow, and underwear into evidence?

17

A. Yes, along with the pillow case, yes.

Q. Okay. And that underwear was the same underwear that y'all had discovered in the trash can?

A. Yes.

Q. You also stated in your direct testimony that when you got there, [V.H.] was there and that you never left the scene and she never left the scene throughout the whole time, correct? You had stated on your direct that when you arrived on the scene, [V.H.] was there and that you and [V.H.] were never separate from each other.

A. Right. She didn't go anywhere, I didn't go anywhere. I stayed right there until we left.

Q. And then you traveled with her to the SANE examine, correct?

A. I drove her there.

Q. And during that drive, you questioned her further about the alleged incident?

A. Uh-huh, yes.

Q. Do you know what happened to the blanket, pillow, and underwear that y'all had discovered?

A. I told Officer Arenivaz to take it and put it into evidence.

Q. Okay. And do you know if she did?

A. She did.

Q. You weren't there to actually see her physically put it into evidence, correct?

A. No.

Wright also points to the following testimony by Sergeant Vernon elicited by the prosecutor on redirect:

A. Okay. Yes. In an attempt to get any kind of information, we went door-to-door. Ther''s a house on the south side -- the north side of the tracks from [V.H.'s] house, the south side is another residence and then east of there. West is a business. East

18

is the older folks housing project. And so I went door-to-door and we knocked on all the doors and talked to all the residences trying to see if anybody saw anything, heard anything, could give anymore information at all. Also, went to the house that was just south of [V.H.'s] house also.

Q. [Prosecutor] Okay. And then at some point, did you attempt to take any further statements or interviews of -- or anybody else on your request or somebody else's request of [V.H.]?

A. Not sure. I don't understand what you are asking.

Q. Well, after the 14th, did you have a chance to either call someone to talk to [V.H.] in some respects to take a statement?

A. DPS? Yes.

Q. Now, do you remember the date?

A. No. I got it written down. On 9/19/2011.

Q. And without telling us what she was -- what she said at all in that statement, was that a recorded statement?

A. Yes.

Q. You provided the State with a copy; is that correct?

A. Yes.

Q. And as far as you know, the defense would have a copy, as well, correct?

A. As far as I know.

Q. Okay. And in any event, after September the 19th of '11, when you took that statement -- are you aware that [V.H.] is now deceased?

A. Yes.

Q. And is it customary for the police department to do not only what we would call maybe a general report or initial report, but supplemental reports regarding action you take further in a case?

A. Yes.

19

Q. Did you recall doing those reports for the matters that you've just mentioned?

A. Yes.

Q. And also do you recall doing a report concerning the information of sending the rape kit to El Paso?

A. Yes.

[Prosecutor]: Pass the witness.

While this testimony establishes that Sergeant Vernon spoke to V.H., it does not support Wright's claim that the State introduced into evidence the statements made by V.H. to Sergeant Vernon. As we noted in the background section of our opinion, the written police reports memorializing V.H.'s responses to the police officers' questions were not admitted into evidence for the purpose of being considered by the jury, nor was V.H.'s recorded statement. Accordingly, as there is no support for Wright's assertion that the State introduced into evidence any statements made by V.H. to Sergeant Vernon, we further narrow our inquiry to only testimony regarding statements made by V.H. to Sergeant Arenivaz.

## II. WAS WRIGHT'S SIXTH AMENDMENT RIGHT TO CONFRONTATION VIOLATED WHEN SERGEANT ARENIVAZ TESTIFIED ABOUT STATEMENTS MADE BY VICTIM?

### A. Standard of Review

Whether a statement is testimonial for purposes of the Confrontation Clause is a question of law we review *de novo*. *Langham v. State*, 305 S.W.3d 568, 576 (Tex. 2010); *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex.Crim.App. 2008); *Wall v. State*, 184 S.W.3d 730, 742 (Tex.Crim.App. 2006). A violation of the Confrontation Clause is subject to a harmless error analysis. *Langham*, 305 S.W.3d at 581-582; *Shelby v. State*, 819 S.W.2d 544, 546 (Tex.Crim.App. 1991)(en banc)(relying on *Delaware v. Van Arsdall*, 475 U.S. 673 (1986)).

20

**B.      The Sixth Amendment Right to Confrontation**

The Confrontation Clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. AMEND. VI. The Fourteenth Amendment renders the Clause binding on the States. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). The Confrontation Clause requires that out-of-court statements by unavailable witnesses who "bear testimony," described as a "solemn declaration or affirmation made for the purpose of establishing or proving some fact," be excluded from evidence unless the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 51. However, not all out-of-court statements trigger the Sixth Amendment protection. Only when out-of-court statements are "testimonial" in nature does the State have to show that a defendant was accorded an opportunity to cross-examine the unavailable witness. *Crawford*, 541 U.S. at 51-52.

Examples of the kinds of statements that fall within the "testimonial" category, are "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and [] police interrogations." *Crawford*, 541 U.S. at 68. In *Davis v. Washington*, the Supreme Court clarified that when *Crawford* characterized witness statements arising from police interrogations as "prior testimony" the Court meant:

> [I]nterrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial."

*Davis*, 547 U.S. at 826. The Court in *Davis* further described testimonial police interrogations as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are

21

testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822. Known as the "primary purpose" rule, "[t]he primary focus in determining whether a hearsay statement is 'testimonial' is upon the objective purpose of the interview or interrogation, not upon the declarant's expectations." *De La Paz*, 273 S.W.3d at 680 (relying on *Davis*, 547 U.S. at 822-23).

In determining whether a declarant's statements arise from an interrogation whose primary purpose is to gather evidence for a subsequent prosecution, we are required to look to "all of the relevant circumstances," including "the identity of an interrogator, and the content and tenor of [her] questions." *Bryant*, 562 U.S. at 369. While evidence establishing the existence of an ongoing emergency is "among the most important circumstances" to consider, *id.* at 370, "there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Id.* at 358. "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* at 359.

Moreover, to the extent that an out-of-court statement is offered for some evidentiary purpose other than the truth of the matter asserted, even if the out-of-court statement falls within the definition of "testimonial" statement, it is not objectionable under the Confrontation Clause because "the one who bears 'witness against' the accused is not the out-of-court declarant but the one who testifies that the statement was made, and it satisfies the Confrontation Clause that the accused is able to confront and cross-examine him." *Langham*, 305 S.W.3d at 576-577 (citing *Crawford*, 541 U.S. at 59 n.9)("The Clause also does not bar the use of testimonial statements for

22

purposes other than establishing the truth of the matter asserted.")(citing *Tennessee v. Street,* 471 U.S. 409, 414 (1985)("The *nonhearsay* aspect of [accomplice's] confession—not to prove what happened at the murder scene but to prove what happened when [defendant] confessed—raises no Confrontation Clause concerns.")).

We now turn to the statements made by V.H. to Sergeant Arenivaz to determine whether they were testimonial, and if so, whether their admission violated the Confrontation Clause.

### C. Analysis

Wright primarily argues that the statements made by the victim to law enforcement shortly after the offense occurred were testimonial because the statements were focused on what had occurred in the past and there was no "expressed concern or discussion of an ongoing emergency." The State argues V.H.'s statements in which she provided her name, age, and report that an unknown assailant had entered her home and raped her, made to Sergeant Arenivaz when she first arrived at the crime scene are nontestimonial because these statements were made—not in response to inquiries by a police officer who was primarily engaged in evidence gathering or in preparation for a prosecution—but by a police officer who was primarily engaged in obtaining information so she could determine what assistance to give the victim. We agree with Wright that these statements were testimonial because in our view the circumstances objectively indicate there was no ongoing emergency and the primary purpose of the interrogation was to establish past events relevant to a later criminal prosecution.

While the motivations of Sergeant Arenivaz may be one factor to consider, the testimonial inquiry requires us to account for the motives of both the interrogator and the declarant. *See Bryant*, 562 U.S. at 367-68. Doing so, "ameliorates problems that could arise from looking solely to one

23

participant. . . . [including] the problem of mixed motives on the part of both interrogators and declarants." *Bryant*, 562 U.S. at 367-368. Here, Sergeant Arenivaz responded to a police dispatch for a sexual assault and arrived at the victim's home over an hour after the rape had ended. During her testimony, Arenivaz did not establish any facts that would suggest the primary purpose of the officers' initial inquiries was to accomplish anything other than to memorialize past events for a later criminal prosecution.

For example, Arenivaz did not testify that the victim was seriously injured or in need of emergency medical or psychological assistance at the time she arrived at the victim's residence which might suggest Arenivaz was making inquiries primarily to determine if an ambulance was necessary to save the victim's life or calm her down. To the contrary, Arenivaz was understandably asking questions relevant to only what happened in the past. In response, the victim would have reasonably believed under such circumstances that the information she was providing to police, including her name, age, and report that she was raped, was being gathered so it could be used to find, and then, prosecute her rapist. The fact that the victim was unable to provide identifying information about her perpetrator does not render her statements nontestimonial.

In support of its argument to the contrary, the State directs us to *Cook v. State*, 199 S.W.3d 495 (Tex.App.—Houston [1st Dist.] 2006, no pet.); *Garcia v. State*, 212 S.W.3d 877 (Tex.App.—Austin 2006, no pet.); and *Murray v. State*, 597 S.W.3d 964, 975 (Tex.App.—Austin 2020, pet. ref'd). But these cases do not support the State's position. In *Cook* the defendant was convicted of driving while intoxicated after the State was permitted to introduce into evidence, over his confrontation objection, a tape-recording of a 911 call. *Cook*, 199 S.W.3d at 496-97. The Houston Court of Appeals determined the statements were nontestimonial because the unavailable witness

24

was reporting a crime to police as it was occurring, which means it was not made for the primary purpose of proving *past* events. *Id.* at 498. We find the *Cook* facts distinguishable because this case does not involve statements captured on a 911 call or while this offense was in progress.

In *Garcia*, the defendant was convicted of multiple offenses, including endangering a child, after the State was permitted to introduce into evidence incriminating statements made to a police officer by a witness who never testified. *Garcia*, 212 S.W.3d at 880, 882. The police officer in that case responded to the witness's 911 call within five to ten minutes and determined, based on the witness's statements, that the defendant had kidnapped the witness's child and that the child was still with the defendant. *Id.* at 883-884. The Austin Court of Appeals held the statements were nontestimonial because they were obtained for the primary purpose of responding to an ongoing emergency—a child kidnapping. *Id.* at 884.

Once again, *Garcia's* facts are distinguishable. Here, it is undisputed that the offense had ended an hour before the police arrived. And there is no evidence suggesting V.H. or the police officers believed the victim or anyone else was in *immediate* danger or that they were in the middle of a potentially volatile situation at the time V.H. made her statements. While this record establishes a rapist was at large, this fact alone does not demonstrate the existence of an ongoing emergency such that either the police officer or the witness would reasonably believe the statements were immediately necessary to permit police to timely respond to an ongoing offense, dangerous situation or emergency. *See Bryant*, 562 U.S. at 374 (explaining that the single fact that a shooter's location was unknown, does not "suggest that an emergency continued until [defendant] was arrested . . . a year after the shooting.").

Finally, in *Murray*, the defendant was convicted of sexual assault after the State was

25

permitted to introduce into evidence a SANE report which contained statements by the victim, who was unavailable to testify at trial, that were made two days after the victim was admitted to the hospital. *Murray,* 597 S.W.3d at 973. The Austin Court of Appeals held under these circumstances the statements were nontestimonial notwithstanding the fact that there was no ongoing emergency because the primary purpose for soliciting the victim's statements during the SANE exam was to diagnosis and treat the victim, not to prove past events. *Id.* at 974, 975. Once again, however, *Murray* is distinguishable because here we are considering statements made—not to a nurse during a medical exam, but to a police officer at a crime scene.

In light of the inapplicability of the cases cited by the State as well as the absence of an argument by the State that these statements were not offered to prove the truth of the matter asserted, we hold the statements made by the victim to Sergeant Arenivaz when she first arrived at the crime scene were testimonial and subject to the Confrontation Clause and therefore, the trial court erred by admitting them into evidence. As to the other statements by V.H. about which Sergeant Arenivaz testified, the State does not contend they are nontestimonial. Rather the State argues admission of these statements was harmless. We therefore analyze admission of all statements made by the victim to Sergeant Arenivaz for constitutional harm.

## III.    WAS THE SIXTH-AMENDMENT VIOLATION HARMLESS?

A violation of the Confrontation Clause is subject to a harmless error analysis. *Langham*, 305 S.W.3d at 582; *Shelby,* 819 S.W.2d at 546. The State has the burden, as beneficiary of the error, to prove the error is harmless beyond a reasonable doubt. *Haggard v. State*, 612 S.W.3d 318, 328 (Tex.Crim.App. 2020) (*relying on Deck v. Missouri*, 544 U.S. 622, 635 (2005)). Wright argues that admission of the victim's statements establishing "that a crime had actually occurred" was

26

"critical to the State's case" and without the statements, "the State had a weak case." The State, on the other hand, argues admission of the victim's statements to Sergeant Arenivaz was harmless because they did not "point[] in any way to [Wright]" and there was "overwhelming evidence from sources other than the victim's out-of-court statements, including the DNA evidence" establishing that Wright was guilty.

We engage in a three-prong analysis to determine whether Confrontation Clause error was harmless beyond a reasonable doubt. *Shelby*, 819 S.W.2d at 547. First, because a violation of the right to cross-examination necessarily means testimony was not permitted before the fact finder, we assume the damaging potential of the cross-examination was fully realized. *Id.* Second, with that assumption in mind, when the witness is unavailable, we review the error in connection with the following four factors: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) and the overall strength of the prosecution's case. *Id.*, *see also Langham*, 305 S.W.3d at 582. Third, in light of the first two prongs, we determine if the error was harmless beyond a reasonable doubt. *Shelby,* 819 S.W.3d at 547; *Langham*, 305 S.W.3d at 582.

The statements made by V.H. that were erroneously admitted established the following facts: (1) V.H. was asleep on her sofa in her living room when she heard something, woke up and saw a shadow of a man; (2) she was wearing her nightgown, and panties during the assault; (3) she tried to push the perpetrator away, but he held her down; (4) when the sexual assault ended the perpetrator left; (5) she took a bath and threw the nightgown and panties in the trash can; (6) she could not see the perpetrator because it was dark; and (7) she was not sure if she had locked her

27

door or not.

Here, we are hard pressed to envision circumstances in which the "damaging potential of the cross-examination was fully realized" because this record does not suggest any damaging facts that could have been elicited from the victim on cross-examination regarding the statements she gave to Sergeant Arenivaz that would have been helpful to the defense. At best, the defense may have attempted to show on cross-examination that no force was used and that the sexual episode was therefore consensual. But, in our view, on these facts it was extremely unlikely the jury would have been persuaded by such a theory.

Quite the contrary, the statement establishing the victim was too weak to push off her attacker was corroborated by both her age and her fragility as depicted in the photographs, and the victim's presence six years later would have only highlighted that fact. In addition, the SANE Report documented her age as well as physical signs of vaginal penetration that were consistent with V.H.'s history of sexual assault.

Moreover, there was no evidence establishing Wright knew the victim, much less that they shared a consensual sexual relationship. Cross-examination would not have established the existence of such a relationship. Because the victim did not know her attacker, there was no evidence the victim had a motive to frame Wright for rape, such as revenge for a past grievance. And the fact that the victim did not know her attacker was corroborated by the fact that police were unable to identify the perpetrator until the DNA CODIS match made it possible six years later.

Finally, the evidence linking Wright's DNA to the DNA evidence found on V.H.'s vaginal swab was strong and went unchallenged on appeal. Thus, there was very little, if any, ammunition available to Wright to challenge V.H.'s credibility or the accuracy of her statements to police on

cross-examination. Accordingly, we can say with confidence that any error arising from the admission of these statements by V.H. to Sergeant Arenivaz was harmless beyond a reasonable doubt.

## CONCLUSION

The trial court's judgment is affirmed.


April 20, 2021

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)